## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA

DR. WILSON ASFORA

        Plaintiff

Civ. No. 20- **4032**

v.

C O M P L A I N T

SANFORD HEALTH, a South Dakota
nonprofit corporation; and SANFORD CLINIC,
a South Dakota nonprofit corporation

        Defendants.

COMES NOW, Dr. Wilson Asfora, through the undersigned counsel, and for his Complaint states and alleges as follows:

1.    This Complaint is an action against Sanford Health and its affiliate Sanford Clinic (collectively, "Sanford") for wrongful termination, wrongful breach of an indemnity agreement, defamation, violation of Dr. Asfora's constitutional rights, and conspiracy to violate Dr. Asfora's constitutional rights. This case arises shares common questions of law and fact with claims at issue in *U.S. ex rel Bechtold v. Asfora, et al.*, Civ. No. 16-4115, and substantially overlaps with that action.

2.    Dr. Asfora was not terminated from his Sanford employment for a good reason or a bad reason; he was terminated for illegal reasons.

1

3.    Sanford terminated Dr. Asfora in an attempt to coerce him to settle the Government's FCA lawsuit and accept liability based on allegations that Sanford publicly described as bogus.

4.    Sanford sought to coerce Dr. Asfora into settlement in order to keep facts that cast Sanford in a bad light out of the headlines and public consciousness and to preserve a contemplated merger with another healthcare system.

5.    As part of this misconduct, Sanford engaged in joint action with the Government to deprive Dr. Asfora of the ability to practice medicine.

6.    The federal government wanted Sanford to terminate Dr. Asfora because an unemployed neurosurgeon is a lot easier to defeat in litigation than a neurosurgeon who has ongoing income to afford to mount a defense.

7.    Sanford's decision to terminate Dr. Asfora was contrary to the public policy of South Dakota; violated state and federal law; and violated Dr. Asfora's constitutional rights.

**PARTIES, JURISDICTION, AND VENUE**

8.    On information and belief, Defendant Sanford Health is a non-profit corporation organized under the laws of North Dakota, with its principal place of business in Sioux Falls, South Dakota.

9.    On information and belief, Defendant Sanford Clinic is a non-profit corporation organized under the laws of South Dakota, with its principal place of business in Sioux Falls, South Dakota.

10.    Plaintiff Dr. Wilson Asfora is a former employee of Sanford Clinic, where he worked as a highly-acclaimed neurosurgeon.

2

11.     This Court has original jurisdiction of claims set out in the Complaint under 28 U.S.C. §1331 and supplemental jurisdiction over the related state-law claims under §1367.

12.     Venue is appropriate in this jurisdiction under 28 U.S.C. §1391.

**FACTS COMMON TO ALL COUNTS**

13.     Dr. Asfora is a neurosurgeon who began his employment with Sanford Clinic in 2008.

14.     Dr. Asfora is board certified by the American Board of Neurological Surgery and the Royal College of Physicians and Surgeons.

15.     Dr. Asfora is recognized as one of the premier neurosurgeons in the Upper Midwest, with a diverse and busy practice that includes spine surgery, neuro-oncology and pediatric neurosurgery procedures, neurovascular procedures, and treatment of peripheral nerve conditions.

16.     The breadth of Dr. Asfora's practices made him a particular valuable member of the neurosurgery department, and he was often asked to assist with cases or perform procedures when he was not scheduled for call because other physicians within the department would not or could not perform the procedures.

17.     In addition to his work as a surgeon, Dr. Asfora has also spent over two decades developing innovative products that assist surgeons, improve medical outcomes, and benefit patients.

18.     Dr. Asfora is the patent holder of record for more than 40 patents issued by the U.S. Patent and Trade Office and has pending applications for over a dozen patentable concepts in Europe, Brazil, Hong Kong, and Japan.

19.    Dr. Asfora has had experience inventing and manufacturing medical device products, obtaining regulatory approval, bringing them to market, and then selling the rights to market and distribute the products.

20.    He also has had experience inventing and manufacturing products, obtaining regulatory approval, bringing them to market, and then selling them through a limited liability company of which he and his spouse are sole owners.

21.    Throughout his employment at Sanford, Dr. Asfora and other physicians used the medical devices he had invented to treat patients. These devices included the Dakota Knife, the Asfora Bullet Cage, the Samba Screw, and the Asfora SI-cage.

22.    At all times material to this lawsuit, Sanford was aware that Dr. Asfora had a membership interest in Medical Designs, LLC, and knew and approved of his use of devices sold by that entity in surgeries that he performed at Sanford Clinic on Sanford patients.

23.    From August 2010 until November 2010, Sanford hired David Dubay to work as a director of clinical operations.

24.    By January 2011, Dubay had filed a qui tam complaint alleging that Dr. Asfora and colleagues in the neurosurgical department – including Dr. Brian Wellman – had violated the Anti-Kickback Statute and False Claims Act. Dubay also alleged that Dr. Asfora had violated a federal law governing physician self-referral known as the Stark law.

25.    Sanford was a named defendant in the Dubay suit.

26.    The Government, after undertaking an investigation of nearly 18 months, declined to intervene in DuBay's complaint.

27.     Sanford, Medical Designs, LLC, and the individual Defendants entered into a settlement agreement with DuBay and the federal government in which each Defendant denied any liability.

28.     The DuBay settlement was finalized in December 2013.

29.     Thereafter, Dr. Wellman turned on Dr. Asfora and began to recruit other physicians at Sanford to join a campaign that was intended to cause Dr. Asfora to leave Sanford or to cease practicing medicine altogether.

30.     At all times material to this lawsuit, Sanford was aware of Dr. Wellman's animus toward Dr. Asfora and received a number of complaints from Dr. Wellman that it investigated and determined to be without merit.

31.     In the summer of 2015, Dr. Wellman and other non-party co-conspirators put into motion their plan to drive Dr. Asfora from Sanford or the practice of medicine.

32.     Dr. Wellman contacted Sanford executives in the Compliance Department and complained that Dr. Asfora was using devices sold to Sanford by Medical Designs LLC in his surgeries.

33.     Sanford was well aware of Dr. Asfora's use of devices manufactured and sold by Medical Designs, LLC, all of which had been vetted in accordance with Sanford's procurement and compliance policies.

34.     Sanford undertook a comprehensive investigation of these claims, led by its Chief Compliance Officer, who concluded at some point in September 2015 that Dr. Wellman's allegations were baseless.

35.     Dr. Asfora reasonably relied on the results of the investigation and continued to use products sold by Medical Designs LLC – chiefly the Asfora Bullet Cage – in the course of

treating Sanford's patients when, in his professional medical judgment, such use was medically indicated and in the best interest of his patients.

36.     Unbeknownst to Dr. Asfora, his own supervisor, Dr. Wilde, Sanford's Chief Medical Officer, began to collude with Dr. Wellman in his campaign against Dr. Asfora.

37.     Dr. Wilde's collusion began around the same time period that Sanford's compliance department concluded its investigation.

38.     In September 2015, Dr. Wilde – Dr. Asfora's direct supervisor – met with Dr. Wellman and others to brainstorm ideas on how to get Dr. Asfora fired or how to make his professional life so intolerable as to lead him to resign.

39.     During the meeting, Dr. Wilde openly discussed "pathways" that would lead to Dr. Asfora's termination, but would follow a process that would avoid giving Dr. Asfora grounds to sue and win.

40.     Dr. Wilde openly discussed multiple plans that could be pursued in order to cause Dr. Asfora's termination, despite acknowledging Dr. Asfora's skill as a surgeon and contributions to the Neurosurgical Department.

41.     Dr. Wilde shared information with Dr. Wellman and others about how each of those plans might be accomplished and encouraged them to attack Dr. Asfora on multiple fronts.

42.     Dr. Wilde also openly solicited information and ideas from colleagues who had actively sought to sabotage Dr. Asfora's career and credibility and pledged to support that effort, in addition to spearheading his own initiative to accomplish the same objective.

43.     Among other things, Dr. Wilde confided to Dr. Asfora's persecutors that it was his plan to "annoy the [****] out of this guy and see if he leaves" but that he would enact this plan carefully and deliberately so he and Sanford would not get sued.

6

44.     Dr. Wilde was aware that Sanford had agreed to permit Dr. Wellman to "share" his production with another neurosurgeon in the department who performed some procedures that Dr. Asfora performed and that Dr. Wellman did not.

45.     Dr. Wilde knew, or should have known, that Dr. Wellman's compensation would increase if the other neurosurgeon was presented with opportunities to perform surgeries that would otherwise be referred to Dr. Asfora.

46.     Dr. Asfora's direct supervisor aided and abetted Dr. Wellman and others in their effort to get rid of Dr. Asfora and thereby increase their own production and compensation.

47.     Sanford has known about Dr. Wilde's wrongful misconduct and, on information and belief, has taken no steps to discipline him or initiate a corrective action.

48.     Dr. Wilde specifically asked Dr. Wellman and others to assist him in developing and sharing negative information that could be compiled into a dossier Dr. Wilde could use against Dr. Asfora.

49.     After the meeting with Dr. Wilde, Dr. Wellman and others were emboldened to open up additional fronts on their attack against Dr. Asfora.

50.     Dr. Asfora executed an Amended Employment Agreement in early November 2015.

51.     In late November 2015, Dr. Wellman and others drafted an unsigned anonymous letter and sent it to the South Dakota Board of Medical Examiners.

52.     The letter – signed by "Concerned Physicians" – made false accusations of and concerning Dr. Asfora's medical practice, the care and treatment he provided to patients, and his use of medical devices in his surgical practice that he invented and that his companies manufactured and sold.

7

53.     The complaints were filed for unfair and unjustified purposes, including many of the purposes that were openly identified and discussed with Dr. Wilde.

54.     Sanford again investigated the complaints and once again determined that there was no cause to terminate Dr. Asfora or suspend his practice privileges.

55.     On multiple occasions, Sanford was confronted with evidence of Dr. Wellman's animus toward Dr. Asfora and determined that his allegations were being pursued for improper purposes and were factually baseless.

56.     Sanford's repeated decision not to intercede and address Dr. Wellman's misconduct left Dr. Asfora exposed to renewed attempts to discredit and attack him.

57.     These attempts were part of a campaign that Dr. Wilde, Dr. Asfora's direct supervisor, had openly discussed with Dr. Wellman and in which Dr. Wilde had himself participated.

58.     In addition to plotting with Dr. Wellman and others, Dr. Wilde engaged in an active effort to suppress information that Dr. Asfora brought to his attention concerning Dr. Wellman's deficient medical care and practices by Dr. Wellman and others in the neurosurgical department that put patients directly at risk.

59.     Dr. Asfora was instructed by Dr. Wilde and other Sanford representatives not to document his concerns in writing and not to file any complaints against Dr. Wellman.

60.     In December 2016, Dr. Wellman filed an employment grievance with Sanford.

61.     The grievance challenged Dr. Asfora's medical decisions in caring for a patient who suffered severe complications after a surgery by Dr. Wellman and also continued Wellman's pattern of making unsubstantiated allegations against Dr. Asfora.

8

62.    The Complaint concerned a dispute between Dr. Wellman and Dr. Asfora regarding one of Dr. Wellman's patients, who ultimately lost his life.

63.    Sanford hired an outside law firm to investigate the allegations.

64.    The independent investigator hired by Sanford concluded that Dr. Wellman's allegations were unfounded, that statements he made were inaccurate, and that statements he attributed to other Sanford physicians were inaccurate.

65.    The investigator went further, noting that the credibility of Dr. Wellman's grievance was called into question by significant differences between his description of the facts and statements of other witnesses.

66.    This is not the first time that Dr. Wellman's credibility has been called into question.

67.    As Sanford knew, or should have known, a federal judge presiding in a case in the District Court of South Dakota rejected testimony that Dr. Wellman offered as a retained expert witness on the grounds that it lacked credibility.

68.    In *Owen v. United States*, 645 F.Supp2d 806 (D.S.D. 2009), Dr. Wellman offered expert testimony on behalf of a defendant physician and opined that the physician acted in accordance with the standard of care.

69.    The Court "did not find credible Dr. Wellman's opinion" and explained that the opinion "relies on a reading of [a medical record] that the Court has rejected, fails to consider the testing that [defendant-physician] should have done, and fails to take into account the dynamic process of [the patient's] condition."

70.    By the close of its internal investigation and rejection of Dr. Wellman's account, Sanford was on notice of any number of incidents that would justify terminating Dr. Wellman.  It

was aware that Dr. Wellman was professionally incompetent, that he made unfounded allegations, that he affirmatively misrepresented the truth and distorted what other Sanford physicians had said, and that he repeatedly tried but failed to impugn Dr. Asfora's reputation and have him terminated based on trumped-up allegations and outright lies.

71.     Sanford was also on notice that Dr. Asfora believed that Dr. Wellman and others had created a hostile work environment and engaged in unlawful retaliation against him and Sanford knew this to be true.

72.     Despite being apprised of all these facts, Sanford undertook no effort to intercede on Dr. Asfora's behalf, to address the hostile work environment, or to prevent additional misconduct by Dr. Wellman.

73.     Enduring Dr. Wellman's offensive conduct became a condition and term of Dr. Asfora's continued employment.

74.     When Dr. Asfora brought evidence of this offensive conduct to Sanford, he was subjected to unlawful retaliation.

75.     Dr. Wilde, Dr. Asfora's direct supervisor, repeatedly admonished Dr. Asfora not to document incidents of malpractice, harassment, and malfeasance by Dr. Wellman and others and to avoid communicating about such incidents in writing.

76.     Dr. Wilde's conduct was part of his ongoing role as an architect and contributor to the campaign to terminate Dr. Asfora and, if possible, to do so by stealth so as to avoid the possibility that the unlawful conduct would trigger a lawsuit.

77.     Enduring Dr. Wilde's unjustified criticism and ongoing efforts to suppress Dr. Asfora's attempt to bring Dr. Wellman's professional ineptitude to light became a condition and term of Dr. Asfora's continued employment.

78.     The admonishment was intended to have, and did have, a chilling effect on Dr. Asfora's willingness to report misconduct aimed at him and to raise other matters of concern that affected the work that was performed in the neurosurgical department and the care that patients received there.

79.     The misconduct included matters of and concerning patient care and patient safety.

80.     A reasonable person in Dr. Asfora's position who received such admonishment would be unlikely to report matters of workplace concern and public safety concerns or to report hostile work environment and retaliatory misconduct.

81.     Sanford, by and through its agents, aided and abetted Dr. Wellman's unlawful misconduct by refusing to intervene and address it, despite being provided ample evidence – by Dr. Asfora and by its own internal investigations – that Dr. Wellman had acted in bad faith and for improper purposes.

82.     Sanford, by and through its agents, further aided and abetted Dr. Wellman's unlawful misconduct by admonishing Dr. Asfora not to report or make public (a) his concerns about Dr. Wellman's conduct and deficient medical care or (b) his concerns relating to patient care and public safety.

83.     After the SDBMOE had twice rejected Dr. Wellman's false attacks against Dr. Asfora, and after Sanford had investigated and found meritless similar allegations, Dr. Wellman began collecting information from Dr. Asfora's patients and attempted to recruit co-conspirators to join his plan to file a covert lawsuit against Dr. Asfora.

84.     Dr. Wellman and Dr. Bechtold teamed together to file a qui tam lawsuit against Dr. Asfora, Sanford, and Medical Designs LLC.

11

85.     On or about November 2016, Sanford became aware that there existed a qui tam investigation when it received requests for information from the U.S. Government.

86.     Sanford undertook its own investigation as to what prompted the U.S. Government to seek additional information.

87.     When the Complaint was unsealed, Sanford examined the allegations, with the aid of its own internal investigation commencing in November 2016.

88.     Sanford concluded that the qui tam allegations were false and bogus, yet it took no action against repeat offender Dr. Wellman or against Dr. Bechtold.

89.     On information and belief, the Complaint included information that Dr. Bechtold and Dr. Wellman had surreptitiously obtained and, on information and belief, had obtained via means that violated the privacy rights of Sanford patients.

90.     More specifically, a review of the complaint strongly suggests that the relators or their agents accessed patient records in violation of the privacy rights of Sanford patients and in violation of Health Insurance Portability and Accountability Act, as amended.

91.     As the custodian of patient records and employer of the two individuals who appear to have accessed those records under suspect circumstances, Sanford was uniquely positioned to undertake an investigation.

92.     On information and belief, Sanford did not investigate Wellman or Bechtold – much less hold them accountable – for conduct relating to violation of patient's privacy rights.

93.     On information and belief, Sanford has deliberately avoided inquiring into whether the relators gained access to patient records in violation of federal law and in violation of its own internal policies.

94.     On or about June 27, 2019, Sanford announced a planned merger with another healthcare system, UnityPoint Health, which was based in Des Moines, Iowa.

95.     Before and after the merger was announced, Sanford had repeatedly characterized the qui tam allegations against it and Dr. Asfora as meritless and bogus.

96.     Sanford continued to publicly support Dr. Asfora and deny all allegations made in the qui tam relators' complaint.

97.     On June 28, 2019, Chief Medical Officer Dr. Allison Suttle continued to offer unqualified support of Dr. Asfora.  She stated in media reports:  *"Dr. Wilson Asfora is an exceptionally talented surgeon who provides excellent care to his patients," she said. "His unique skills and expertise are a great asset to our region. He has saved the lives of hundreds of patients. The allegations in this lawsuit have been investigated and were found to have no merit. Sanford Health is confident in the care provided to our patients and will continue to provide quality care. We will vigorously defend this baseless suit."*

98.     At the time these statements were made, Dr. Suttle believed them to be true and, based on Sanford's intensive investigation into the qui tam allegations, had a factual basis upon which to rely in making such public statements.

99.     On or about July 4, 2019, members of Sanford's senior leadership team – including Chief Executive Officer Kelby Krabbenhoft, Chief Operating Officer Matt Hocks, and Chief Medical Officer Dr. Suttle – authored an email addressing the Government's intervention that was sent to all Sanford employees.

100.    The system-wide Sanford email noted that the lawsuit contained "bogus allegations leveled against Sanford and Dr. Asfora" and "[was] based on second guessing Dr.

Asfora's professional relationship with Sanford and the care he provided to Sanford patients,

years after the fact."

101.    At the time these statements were made, Krabbenhoft, Hocks and Suttle all

believed them to be true and, based on Sanford's intensive investigation into the allegations, each

executive had a factual basis upon which to rely in making such public statements.

102.    The system-wide email went on to specifically address Dr. Asfora's practice and

reputation as a surgeon, stating:

> Dr. Asfora is a board certified, fellowship-trained neurosurgeon who has saved the lives
> of hundreds of patients for nearly 30 years of practice in South Dakota. He is recognized
> by his colleagues as one of the premier neurosurgeons in the Upper Midwest. In full
> disclosure, on a few personal notes: I, Kelby, have been a patient of Dr. Asfora's in the
> past and last year he performed a cranial surgery that saved my grandson's life; and I,
> Matt, chose Dr. Asfora to be my back surgeon approximately four years ago and I credit
> him with my ability to maintain a healthy and active lifestyle. We are not unique among
> the thousands of patients Dr. Asfora has cared for.
> Beyond Dr. Asfora's storied history and reputation as an excellent surgeon, *we are
> confident that the allegations are without merit because of reviews undertaken by
> Sanford's medical staff and by the South Dakota Board of Medical Examiners.*
> Sanford goes to great lengths to ensure that its physician relationships meet the highest
> standards of compliance.

(emphasis in original).

103.    At all times up to this point, Sanford believed that the accusations against Dr.

Asfora were baseless and bogus.

104.    Sanford undertook a complete, thorough investigation of the relevant facts –

including access to peer review documents, findings by its medical staff, and findings by the

South Dakota Board of Medical Examiners – before sharing its view with the media and with all

of its employees that the allegations were meritless.

105.    Sanford offered very public support of Dr. Asfora, after it had announced a game-

changing merger with another health-care system.

106.    Despite its unqualified and unequivocal denunciation of allegations that Dr. Asfora had engaged in wrongdoing, Sanford's internal calculus changed and it made the decision to settle claims it knew to be meritless and put significant pressure on Dr. Asfora to settle as well.

107.    On information and belief, Sanford's about-face was precipitated by a belief that settlement was advisable to permit the UnityPoint merger to move forward.

108.    Sanford began its new strategy by first seeking to prevent Dr. Asfora from using the devices he had used for decades to achieve patient outcomes that Sanford executives had repeatedly lauded and celebrated.

109.    On or about July 25, 2019, Sanford gave Asfora notice that he would no longer be permitted to use MD LLC devices in surgeries that he performed at Sanford Health.

110.    For the entirety of Dr. Asfora's tenure as an employee of Sanford Clinic, Dr. Asfora had used devices and the matching instrumentation he had invented in the course of treating patients.

111.    At the time Dr. Asfora was first hired by Sanford in 2008, he had been regularly using the Asfora Bullet Cage for over nearly a decade to help patients with spinal and back problems.

112.    Sanford had repeatedly approved of Dr. Asfora's use of such devices and had represented to the Government itself that the Asfora Bullet Cage was superior in quality to other alternatives.

113.    Sanford's decision was unrelated to any concern for patient safety – indeed, the decision did not take into account the best interests of the patient.

15

114.    At the time Sanford informed Dr. Asfora he could no longer use devices he had invented, it did not inform him that it had changed its position with respect to the lawsuit or with respect to his continued employment with Sanford.

115.    On information and belief, Sanford had commenced covert negotiations with the Government and either affirmatively offered, or was induced to offer, to make Dr. Asfora's fate a bargaining chip in the settlement process.

116.    As part of the settlement, Sanford agreed to terminate Dr. Asfora's employment and his hospital privileges, which effectively cut off his main source of income.

117.    On August 19, 2019, Michael Farritor, Vice President of Sanford Clinic, sent Dr. Asfora a letter indicating that his employment was being terminated, that his last day of employment would be September 24, 2019, and that as of that date he would no longer enjoy hospital privileges at any Sanford facility.

118.    Dr. Asfora sought clarification regarding this decision and Sanford replied on August 22, 2019 indicating that it had its decision because Dr. Asfora had failed to disclose his ownership interest in SiCage LLC to its compliance department.

119.    Sanford's explanation regarding its termination decision is false.

120.    Sanford maintained that Dr. Asfora failed to adequately disclose information relating to his ownership interest in Sicage LLC.

121.    Beginning in 2018, Sicage LLC manufactured and sold certain medical devices Dr. Asfora had invented.

122.    Before any medical device may be used in the Sanford health system, the manufacturer must submit detailed information to Sanford's supply chain department, which includes but is not limited to information relating to the device's use and regulatory status.

123.    Sanford's internal policies require that it vet and approve any medical device that is used in the course of providing patient care.

124.    Sanford personnel charged with implementing these policies had a long-standing relationship with Dr. Asfora and employees of MD LLC.

125.    These individuals knew and understood that Dr. Asfora owned Sicage LLC and that it employed the same individuals as were employed by MD LLC.

126.    Surgeons, nurses, and other individuals in Sanford's system knew and understood that Dr. Asfora owned Sicage LLC, that the company manufactured and sold products that he had innovated, and that it employed the same individuals as were employed by MD LLC.

127.    Sicage LLC was organized under South Dakota law in 2015, and the documents filed with the South Dakota Secretary of State at that time identified Dr. Asfora as the organizer.

128.    Sicage LLC submitted annual filing statements submitted to South Dakota Secretary of State in 2016, 2017, 2018, and 2019.   All of the filing statements are publicly available.  All such publicly available documents identified Dr. Asfora by name.

129.    When asked to produce records in its possession relating to Sicage LLC and the process under which it was approved for use in the Sanford system, Sanford explained that its personnel had deleted emails and other information addressing the Sicage medical devices.

130.    The spoliation of this material evidence occurred during the pendency of the OIG investigation into the *qui tam* investigation, when Sanford had an affirmative duty to preserve all potentially relevant information.

131.    On information and belief, the spoliation of evidence that Sanford had a duty to preserve included evidence that would have, and could have, demonstrated Sanford's knowledge

of Dr. Asfora's ownership of Sicage LLC and fatally undermined any claim that such ownership led to Dr. Asfora's termination.

132.    Sanford's contention that it was caught unaware of Dr. Asfora's relationship with Sicage and that the relationship led to Dr. Asfora's termination is demonstrably false and served as an unlawful pretext to its unlawful termination of Dr. Asfora's employment.

133.    On October 25, 2019, roughly a month after Dr. Asfora's termination became effective, Sanford entered into a settlement agreement with the Government.

134.    Under the terms of the Settlement Agreement, Sanford agreed to pay the Government $20,250,000.00.

135.    The Agreement between Sanford and the Government includes the following recital:

> *On August 19, 2019, Sanford informed Asfora in writing that his employment with Sanford would be terminated as of September 24, 2019. Effective September 24, 2019, Sanford terminated Asfora's employment. Furthermore, Sanford has taken steps to prohibit all Sanford physicians from profiting from their choice of medical devices to use in procedures at Sanford Medical Center.*

*Id.*

136.    In an internal email dated October 28, 2019, COO Hocks told his colleagues

> *As you know, Sanford took these allegations seriously, including suspending the use and purchase of Dr. Asfora's devices. We then severed our relationship with him, based solely on his business practices — not his medical care. We are confident that Sanford acted appropriately and in good faith in the conduct of this matter, and we believe collaborating with the federal government on this settlement was in the best interest of our patients.*

E-mail, 10/28/2019.

137.    Hocks published these statements knowing and expecting that they would be shared with the media and re-published.

138.    Hocks's email contains demonstrably false statements of fact of or concerning Dr. Asfora and these false statements were made knowingly and with actual malice.

139.    Dr. Asfora's termination was a material condition that the Government imposed and that the Sanford agreed to satisfy, as part of the global settlement agreement.

140.    The condition was not expressly set out in the body of the Settlement Agreement, nor did Hocks announce it publicly.  This was for good reason:  lawyers in Washington, D.C. are not supposed to regulate the practice of medicine in South Dakota, and federal government officials are not supposed to conspire with adverse parties in the course of settling claims to deprive co-defendants of a right to earn a livelihood and to defend themselves.

141.    Sanford understood that it was required to keep Dr. Asfora from practicing medicine as part of its settlement with the Government, but also understood that it was not to advertise that fact or explain to Dr. Asfora what it was up to.

142.    Sanford's understanding is made clear in its response to requests from the mother of a patient (who also happened to be a Sanford employee) who had previously undergone surgery by Dr. Asfora.

143.    J.S. is mother of K.H., a developmentally disabled adult who was born prematurely and who suffers from a variety of medical conditions, including hydrocephalus, that have required her to undergo dozens of surgeries over the course of her life.

144.    K.H.'s condition requires that cerebrospinal fluid that accumulates in her brain be drained into other areas of her body.  K.H. needs the shunt system to function in order to live.

145.    K.H. began to experience complications when the cerebro-spinal fluid was drained to her abdomen and other areas that physicians choose as their initial options.

146.    Because of complications, Dr. Asfora performed a surgery on K.H. in 2016 in which the cerebro-spinal fluid brain was drained to her heart, where it would be dispersed via the pumping of the blood.

147.    Draining this fluid to the heart – a procedure known as ventriculoatrial shunt placement – is an option of last resort, because of potential complications that can arise from the surgery, which is very complex and difficult.

148.    After Dr. Asfora placed the ventriculoatrial shunt in Kendra's heart in 2016, she did not need to have another surgery for 3 years, which was the longest she ever went between surgeries.

149.    In 2019, K.H. has had numerous shunt surgeries.  She had one surgery in March 2019, two in July 2019, one in October 2019, one in November 2019, and two so far in December 2019.  Dr. Asfora performed the surgeries in March and July 2019

150.    In late October 2019 – after Dr. Asfora's termination had gone into effect – another neurosurgeon on staff replaced her ventricular catheter to her brain because it had occluded and was not properly draining.

151.    After Dr. Asfora's employment had been terminated, no other physician on staff was capable of performing the ventriculoatrial shunt procedure.

152.    J.S., mother of K.H., reached out to CEO Kelby Krabbenhoft and begged him to permit Dr. Asfora to have his privileges reinstated solely for the purpose of performing this surgery for K.H.

153.    Mr. Krabbenhoft did not take exception to her communication and was gracious in his responsive email sent on December 14, 2019.  He stated:  "Asfora is the best surgeon I've ever known," and "He still can do surgery at our Hospital."

20

154.    On December 17, 2019, COO Matt Hocks spoke with J.S.   She explained why she felt that it was in the best interests of K.H. to be treated by Dr. Asfora and shared her enthusiasm and gratitude that CEO Krabbenhoft had confirmed it was possible for him to do so.

155.    Mr. Hocks told J.S. that Sanford could not allow Dr. Asfora privileges to perform the surgery.

156.    When J.S. asked, "What about what Kelby said?" and Hocks replied – "Kelby thought [Dr. Asfora] could, but **our hands our tied - because of the government, we cannot do it**." (emphasis supplied).

157.    Dr. Asfora was not terminated for "business reasons," or for his "business practices," and Hocks affirmatively knew that to be the case at the time he disclosed his statements with the aim, intent, and understanding that the email would be leaked to local media.

158.    Mr. Krabbenhoft, for his part, was apparently unaware that, in addition to the stated terms of the settlement agreement, Sanford had agreed to an unstated but material term:  it would not reinstate Dr. Asfora as an employee or reinstate his privileges to practice medicine.

159.    The federal government is expressly forbidden from deciding who can and cannot practice medicine.  That is a matter to be regulated by the individual states.

160.    The first section of the Medicare statute states:  "Nothing in this title shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . . . " 42 U.S.C. §1395.

161.    At all times material to these claims, it was clearly established that the federal government could not exercise supervision or control over the practice of medicine or the manner in which medical services are provided, just as it was clearly established that the federal

government could not engage in joint action with another party to deprive a citizen of his or her right to earn a livelihood.

162.    The South Dakota Board of Medicine has repeatedly addressed bad-faith allegations from Dr. Wellman and others that Dr. Asfora had engaged in unnecessary or overly aggressive medical procedures and has repeatedly exonerated him.

163.    Before Sanford's internal calculus had changed, it repeatedly cited the findings of South Dakota Board of Medicine in explaining why allegations against it and Dr. Asfora were bogus.

164.    In conspiring together with Sanford, the federal government had its own incentives:  it could banish Dr. Asfora from the practice of medicine and prevent him from mounting an effective defense against its allegations in the FCA claim.

165.    Sanford, in the process of settling claims it believed and proclaimed to be bogus, effectively banished from practicing medicine a physician who had saved countless of its patients' lives and who – according to its senior leadership – was the most skilled surgeon that Sanford employed.

166.    In the process, Sanford violated the terms of contractual agreements it entered with Dr. Asfora, violated the public policy of South Dakota, violated state and federal law regarding retaliation, and violated Dr. Asfora's fundamental constitutional rights.

**COUNT I:          WRONGFUL TERMINATION OF EMPLOYMENT IN
                    VIOLATION OF PUBLIC POLICY**

167.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

168.    Sanford wrongfully terminated Dr. Asfora for an improper purpose in violation of South Dakota's public policy.

169.    Dr. Asfora's reports regarding Dr. Wellman's incompetence and other concerns about the neurosurgical department were intended to benefit the public at large and constitute whistleblowing activity that South Dakota protects as a matter of public policy and established law.

170.    Individual who engage in this protected activity may not be subjected to retaliation or to termination of their employment.

171.    When Dr. Asfora sought to relate concerns about Dr. Wellman's deficient medical care and other pervasive problems in the neurology department, he was admonished by his supervisor not to put such concerns in writing.

172.    Sanford sought to terminate Dr. Asfora and to compel him to settle claims it believed were bogus and meritless, in order to prevent Dr. Asfora from defending against his claims and, in the process, making public the significant deficiencies in medical care that his colleagues provided and the significant risks that Dr. Wellman and others posed to the public at large.

173.    Sanford also sought to terminate Dr. Asfora and to compel him to settle claims it believed were bogus and meritless, in the hopes of keeping unsavory facts relating to Dr. Wellman and his colleagues out of the public eye and preserving its opportunity to pursue the Unity Care merger.

174.    South Dakota has a clear public policy of protecting employees who report safety violations, employee incompetence misconduct, and other matters that imperil the public interest.

175.    This public policy is reflected and embodied in the letter and spirit of SDCL Chapter 20-13 and in judicial decisions of the South Dakota Supreme Court and of federal courts interpreting South Dakota law, including *Dahl v. Combined Ins. Co.,* 621 N.W.2d 163 (S.D. 2001) and *Hallberg v. South Dakota Board of Regents,* ____ N.W.2d ____ (S.D. 2019).

176.    Sanford terminated Dr. Asfora's employment in contravention of this public policy.

177.    South Dakota has a public policy of protecting individuals who engage in activity that is intended to advance the purposes and interests of SDCL Chapter 23-10 and, in particular, in protecting such individuals from retaliation and other adverse conduct that would impede or deter a reasonable person from engaging in such activity.

178.    South Dakota also has a public policy of protecting employees who report actual or suspected wrongdoing by co-workers in the aim of protecting the public.

179.    Sanford terminated Dr. Asfora's employment in contravention of this public policy of protecting individuals who engaged in protected activity and proscribing employer retaliation.

180.    Sanford's public statement that it terminated Dr. Asfora as a "business decision" and out of concern for his "business practices" was knowingly false and a pretext for its actual, improper motivation.

181.    Sanford's wrongful termination of Dr. Asfora damaged him in an amount to be proven at trial.

**COUNT II:        WRONGFUL RETALIATION IN VIOLATION OF PUBLIC POLICY**

182.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

183.    Dr. Wilde had joined in the conspiracy against Dr. Asfora that was originated by Dr. Wellman and he sought to advance the purposes of that conspiracy by using his position as Dr. Asfora's position to suppress Dr. Asfora's concerns about Dr. Wellman's care for patients and to avoid documentation of those concerns.

184.    Sanford, by and through its agents, retaliated against Dr. Asfora by admonishing him not to document matters of physician incompetence and misconduct, by actively attempting to deter his participation in whistleblowing activity, and by requiring that he endure the false and baseless attacks by Dr. Wellman and other co-conspirators as a term and condition of his employment.

185.    Sanford further retaliated against Dr. Asfora by terminating his employment in September 2019, with the aim of compelling him to settle claims it knew to be meritless, which would keep under wraps embarrassing evidence of the dysfunction and physician incompetence in its neurosurgical department.

186.    Sanford further retaliated against Dr. Asfora by defaming him and attacking his business and personal character in statements that were published to media outlets in the course of trying to explain why Sanford was paying $20 million to settle claims that it described as meritless and bogus and that it actually believed were meritless and bogus.

187.    Dr. Asfora suffered damages as a result of this pattern of retaliatory conduct in an amount to be proven at trial.

188.    Sanford's misconduct toward Dr. Asfora was knowing, willful, wanton and malicious, and Dr. Asfora is entitled to recover punitive damages in an amount to be proven at trial.

**COUNT III:**      **WRONGFUL BREACH OF INDEMNIFICATION AGREEMENT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING.**

189.   Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

190.   When the qui tam lawsuit first came into light, Sanford and Dr. Asfora had entered into an indemnity agreement under which Sanford had agreed to advance one-half of the costs that Dr. Asfora incurred in defending the lawsuit.

191.   Sanford had engaged no less than four law firms by this time and repeatedly encouraged Dr. Asfora to identify national counsel to assist with interactions with lawyers based at the Department of Justice in Washington, D.C.

192.   Consistent with the terms of the indemnity agreement, Dr. Asfora furnished notice that he had retained additional legal assistance.

193.   After receiving notice from Dr. Asfora, Sanford promptly informed Dr. Asfora that it would be terminating the indemnity agreement.

194.   Doing so permitted Sanford to avoid the cost of paying for the additional legal assistance that it had been urging Dr. Asfora to retain.  It also put coercive pressure on Dr. Asfora to settle the bogus lawsuit, which would keep embarrassing disclosures relating to the dysfunction within the neurosurgical department out of the public eye.

195.   Sanford breached its indemnification agreement with Dr. Asfora and engaged in bad faith.

196.   Sanford breached its obligation to Dr. Asfora in the hopes of advancing its own bargaining position with the Government and forcing Dr. Asfora to settle claims that Sanford knew to be bogus and meritless rather than pay defense costs all on his own.

197.    Dr. Asfora was Sanford's agent and he justifiably relied on statements from members of its compliance and legal departments indicating that it was permissible to use medical devices manufactured and sold by companies he owned in surgeries he performed on Sanford's patients.

198.    The contractual indemnity obligations are valid, enforceable, and remain in full force and effect.

199.    Sanford's baseless repudiation of its obligations was and is ineffective as a matter of law.

200.    Dr. Asfora has been damaged by Sanford's wrongful misconduct and is entitled to recover the full extent of recoverable damages caused thereby, in an amount to be proven at trial.

**COUNT IV:        DEFAMATION**

201.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

202.    Statements by COO Hocks about Dr. Asfora's termination in the October 28, 2019 were statements of fact or statements that otherwise implied that Hocks had personal knowledge of facts on which such statements were based.

203.    The statements were false assertions of fact and/or implied objectively false statements of fact.

204.    The statements were published knowing that they would be disseminated to and re-published by the media.

205.    The statements were part and parcel of Sanford's media campaign to explain why it was paying $20 million to settle claims that it described as meritless and bogus and that it actually believed were meritless and bogus.

27

206.    It was expected and intended that these statements would be re-published and disseminated to media in South Dakota and would reach former patients and colleagues of Dr. Asfora, other medical providers with which he might seek employment, and the public at large.

207.    The statements were false in what was actually stated and by reasonable implication, including but not limited to the statement that Sanford "severed" its relationship with Dr. Asfora because of his business practices and the implication that Sanford was unaware of Dr. Asfora's ownership of device companies.

208.    The statement also is false by omission, as it fails to identify what actually motivated and concerned Sanford in deciding to make a sacrifice out of Dr. Asfora to curry favor with the Government and preserve the opportunity for a merger.

209.    Sanford, by and through Hocks, made these statements with actual malice, knowing that they were false or in reckless disregard of their truth or falsity.

210.    Dr. Asfora has been injured as a direct and foreseeable consequence of Defendants' defamatory statements.

211.    Sanford's misconduct was knowing, willful, and malicious, and Dr. Asfora is entitled to recover all compensatory and punitive damages in an amount to be proven at trial.

**COUNT V:        VIOLATION OF SUBSTANTIVE DUE PROCESS**
**(FUNDAMENTAL RIGHT TO EARN A LIVELIHOOD)**

212.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

213.    The right to engage in a calling and to earn a living is implicit in the concept of ordered liberty and derived from our Nation's history and tradition.

214.    Dr. Asfora has a fundamental right to engage in a calling and earn a living that is protected under the United States Constitution.

28

215.    Sanford violated Dr. Asfora's liberty interest – which encompasses the freedom to engage in a calling and earn a living – by terminating his employment and propagating false statements regarding his termination, in the course of and in furtherance of joint action with the federal government.

216.    As a direct and foreseeable consequence of terminating Dr. Asfora and propagating false statements regarding his termination, Sanford intended to, and in fact did, deny Dr. Asfora the ability to continue engaging in the practice of medicine.

217.    As a result of Sanford's wrongful misconduct, Dr. Asfora has wrongfully been denied the ability to practice medicine and been shut out of the profession across the geographic expanse of Sanford's healthcare footprint.

218.    Sanford acted under color of law as a willful participant in joint activity with the federal government and in conspiracy with the federal government to violate Dr. Asfora's constitutionally-protected rights.

219.    On information and belief, the Government sought to negotiate Dr. Asfora's termination as an undisclosed condition of settlement.

220.    On information and belief, the Government sought to have Dr. Asfora terminated so he would lack funds necessary to sustain a defense against its claims.

221.    Sanford, and only Sanford, was in a position to assure that Dr. Asfora would be terminated under circumstances that would effectively blacklist him and prevent him from practicing medicine.

222.    On information and belief, the Government sought to leave Dr. Asfora unable to practice medicine and unable to continue to work to sustain the funds necessary to pay for his defense.

29

223. Sanford sought to leave Dr. Asfora without the ability to defend himself, so he would settle claims that it knew were bogus and thereby avoid the harmful media coverage and reputational harm that would result if facts relating to its dysfunctional neurosurgical department came to light.

224. The conscience of a reasonable person would be shocked to learn that a non-profit healthcare system fired its most talented surgeon and left needy patients without access to the only physician who could perform the procedures they needed to advance its own self-interest and appease the federal government.

225. The conscience of a reasonable person would be shocked to learn that a non-profit healthcare system would intentionally seek to blacklist its most talented surgeon and prevent him from practicing medicine and earning a livelihood, so that he would be more likely to settle lawsuit that it knew to be baseless and less likely to expose facts about its employees and executives that would cast the health system in a bad light.

226. The conscience of a reasonable person would be shocked to learn that a non-profit healthcare system declined to give its most talented surgeon staff privileges to perform surgery on a developmentally disabled adult patient who had been treated numerous times by that surgeon and who needed a surgery that no other physician employed by that non-profit healthcare system.

227. The conscience of a reasonable person would be further shocked that the reason the non-profit healthcare system could not grant the surgeon privileges was because it had made a secret deal with the Government that would keep the surgeon on the sidelines and unable to earn a salary necessary to fund his defense.

228. Sanford has violated Dr. Asfora's fundamental right to work and to earn a living and he has suffered damages as a result of Sanford's unconstitutional misconduct.

229. Dr. Asfora is entitled to recover damages in an amount to be proven at trial.

**COUNT VI:        VIOLATION OF PROCEDURAL DUE PROCESS**

230. Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

231. Dr. Asfora enjoys a property interest in his employment and had a reasonable expectation in the continuation thereof.

232. Dr. Asfora's reasonable expectation of continued employment derives from Sanford's express policies and conduct with respect to his employment status.

233. Sanford violated Dr. Asfora's procedural due process rights by wrongfully terminating his medical staff privileges without a hearing and on unlawful and improper grounds.

234. Sanford, acting in concert with the Government, terminated Dr. Asfora's employment without due process and for illegal and unlawful reasons.

235. Furthermore, and in the alternative, Sanford, acting in concert with or at the direction of the Government, publicly created and disseminated a false and defamatory impression about Dr. Asfora in the course of terminating his employment.

236. Sanford violated Dr. Asfora's procedural due process by wrongfully terminating his medical staff privileges without a name-clearing hearing and on unlawful and improper grounds.

237. As a direct and foreseeable consequence of disseminating false statements regarding Dr. Asfora's termination, Sanford has blackened Dr. Asfora's name and reputation,

caused a stigmatizing effect on Dr. Asfora's future employment opportunities, and deprived him of liberty without due process of law.

238.    As a direct and foreseeable result of Sanford's misconduct, Dr. Asfora was deprived of due process under the law, suffered harm as a result, and is entitled to recover damages in an amount to be proven at trial.

**COUNT VII:        CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985**

239.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

240.    Sanford, having decided to attempt to settle claims it knew to be bogus, agreed to act jointly with the federal government and conspire to deprive Dr. Asfora of the equal protection of the laws and equal privileges and immunities under the laws.

241.    This misconduct by Sanford interferes with and attacks rights of Dr. Asfora that are otherwise protected by law, including but not limited to his right to earn a living and his right to due process under the law.

242.    Sanford, having decided to attempt to settle claims it knew to be bogus, agreed to act jointly with the federal government and conspire to hinder, restrict, or prevent Dr. Asfora from participating in a federal judicial proceeding.

243.    This misconduct by Sanford interferes with Dr. Asfora's substantive right to participate in federal judicial proceedings free of interference and without injury to his person and property.

244.    By terminating Dr. Asfora's his employment, repudiating its indemnity obligations, and publishing false accounts in the media regarding its motivations for the termination and for settling with the Government, Sanford sought to compel Dr. Asfora to settle

claims that Sanford knew were bogus, in order to keep out of the public eye facts about other physicians and its dysfunctional neurosurgical department that would cast it in a negative light and that may imperil its merger discussions with Unity Health.

245.    Sanford sought to "blacklist" Dr. Asfora from the practice of medicine by making false statements about the basis of its termination decision to the media.

246.    Sanford took this action to coerce Dr. Asfora into believing he had no choice but to settle.   If Dr. Asfora settled, the misconduct and dysfunction within the neurosurgical department and within Sanford's medical system generally was unlikely to be exposed.

247.    Further, if Dr. Asfora was coerced into settling, then it was much less likely that Sanford's aspirations for the Unity Health merger would be threatened.

248.    Sanford took these actions acting under color of law, as an instrument of the federal government.

249.    The interrelated objectives of the conspiracy included (1) preventing Dr. Asfora from earning a living, which in turn would coerce and pressure him to settle bogus claims because he would no longer have income by which he could fund his defense; and (2) hindering or preventing his participation in federal judicial proceedings and thereby increasing the potential for a successful merger with Unity Health.

250.    By and through acts in furtherance of this conspiracy, Sanford did injure Dr. Asfora in his person and property and did deprive him of having and exercising rights and privileges.

251.    The injuries were the direct, proximate, and foreseeable result of Sanford's joint action and agreement with the Government.

33

**COUNT VIII:        INDEMNIFICATION AND CONTRIBUTION ON
GOVERNMENT'S COMMON LAW CLAIMS**

252.    Dr. Asfora re-states, re-alleges, and incorporates by reference each preceding paragraph, as though fully set forth herein.

253.    In *ex rel Bechtold,* the parallel suit that concerns common questions of law and fact as are at issue here, the Government maintains that Dr. Asfora has been unjustly enriched, has benefitted from payment by mistake, or is otherwise obligated to disgorge monies received as a result of conduct alleged to be illegal.

254.    The conduct in question – including the use of devices sold and manufactured by entities in which Dr. Asfora had an ownership interest – occurred while Dr. Asfora was a Sanford employee and in the course of employment.

255.    At all times, Sanford knew and approved of Dr. Asfora's use of devices marketed and sold by Asfora Entities in medical procedures he performed as a Sanford employee.

256.    At all times, Sanford, in its statements and conduct, confirmed that such use was permissible and actively encouraged Dr. Asfora to continue to develop new innovative products and to use products that he owned.

257.    Dr. Asfora was entitled to rely on Sanford's opinion that he could permissibly use Asfora Entity devices in surgeries that he performed as a Sanford employee.

258.    Sanford has definitively concluded and affirmatively stated that none of the surgeries identified by relators or the Government were medically unnecessary.

259.    To the extent that the Government obtains relief against Dr. Asfora on any common-law claim relating to the use of an Asfora Entity device in an otherwise medically necessary procedure, Sanford is obligated to indemnify him.

**WHEREFORE,** Plaintiff Dr. Wilson Asfora prays for Judgment against Defendants, jointly and severally, as follows:

1.  For actual, consequential, compensatory, and non-compensatory damages caused by Defendants in an amount to be determined by the jury.

2.  For punitive damages in an amount to be determined by the jury.

3.  For attorney's fees and expenses, costs, and disbursements

4.  For such other further relief as this Court deems appropriate under the circumstances.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Date:  February 20, 2020.

CADWELL SANFORD DEIBERT & GARRY LLP

By _____

Stephen C. Landon
Brett A. Lovrien
Alex M. Hagen
200 E. 10th Street, Suite 200
Sioux Falls, South Dakota 57104
(605) 336-0828
E-mail: ahagen@cadlaw.com
Attorneys for Plaintiff

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DR. WILSON ASFORA | SANFORD HEALTH, A SD NONPROFIT CORPORATION; AND SANFORD CLINIC, A SD NONPROFIT CORPORATION |

**(b)** County of Residence of First Listed Plaintiff    **LINCOLN**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
STEPHEN C. LANDON, BRETT A. LOVRIEN AND ALEX M. HAGEN, CADWELL SANFORD DEIBERT & GARRY LLP, 200 E. 10TH STREET, SUITE 200, SIOUX FALLS, SD 57104; (605) 336-0828

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1985; U.S. CONST. AMEND V

Brief description of cause:
CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS; VIOLATION OF CONSTITUTIONAL RIGHTS

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE  PIERSOL     DOCKET NUMBER  16-4115

DATE
02/20/2020

SIGNATURE OF ATTORNEY OF RECORD
*Alex M. Hagen*

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE